(43 Misc. Rep. 172.)

STRICKLAND v. NATIONAL SALT CO. et al.

(Supreme Court, Special Term, New York County. March, 1904.)

1. CORPORATIONS—INSOLVENCY—RECEIVER'S SALE—VALIDITY—CONFIRMATION.

A new corporation, organized to take over the stock of an insolvent foreign corporation (the new corporation being the holder of a majority of the stock of the old), had, by the use of a claim it held against the old corporation, promoted the bringing of an action to liquidate its debts. Though the receivers of the old corporation had insisted in the Supreme Court of the state that the corporation was making money, and had subsequently made similar representations in the United States courts in order to prevent the corporation from being put into bankruptcy, they were at the latter time assenting to an application on default for a final judgment in the action, and this application resulted in an order of reference to take proof of the facts stated in the complaint, for the purpose of enabling the court to render judgment. No proceedings were had under the order, and subsequently the receivers, without informing the court of the making of the order, procured ex parte at special term from another justice an order to advertise for bids for the property on only two weeks' notice, though the property was extensive and situated in different counties. Bids failing to be made, they subsequently procured from such justice an order to sell at public auction. At the auction the property was sold as a whole to the new corporation. *Held*, that confirmation of the sale would be refused at the instance of minority stockholders of the insolvent corporation.

**2. SAME—TERMS OF SALE—STIFLING COMPETITION.**

Where the terms of the sale provided that the property should be offered in parcels and then again as a whole, and that, if the price for the whole should exceed the aggregate price offered for the parcels, then the property should be struck off to the purchaser of the whole, the provision must be regarded as drawn in the interest of the new corporation (the majority stockholder), and as one tending to stifle competition.

**3. SAME.**

A provision that, if any creditor of the insolvent corporation having a claim allowed by the receivers should become the purchaser, he should be allowed to offset 70 per cent. of his claim against his bid, likewise showed a design to favor the majority stockholder, who was the only creditor having such a claim.

**4. SAME—INADEQUACY OF PRICE.**

Where a bid for property offered at a receiver's sale is less than one-half of its value at forced sale, as estimated by a competent expert, it is inadequate.

Action by Chauncey H. Strickland against the National Salt Company and others. Motion to confirm receiver's report on sale of property of defendant the National Salt Company, an insolvent foreign corporation. Motion denied.

James L. Bishop, for plaintiff.

Charles Thaddeus Terry (William A. Keener, of counsel), for certain minority stockholders.

Putney, Twombly & Putney, for receivers.

Edward Wells, for purchaser Halliday.

Ward, Hayden & Satterlee, for defendant International Salt Co.

LEVENTRITT, J. I cannot grant the motion to confirm the receivers' report. The terms of sale and the manner of their procurement, the method of sale and the manner of bidding, and the gross and patent inadequacy of the price realized combine to shock the conscience of the court, precluding any affirmative act of approval on its part.

It is unnecessary for present purposes to go into any considerable detail, either as to the history of the present litigation or its precedent and accompanying features. It will be sufficient to summarize so much of the hundreds of pages of affidavits, pleadings, and exhibits as will render the conclusion intelligible. The defendant the National Salt Company is a New Jersey corporation, organized on March 18, 1899, for the purpose of manufacturing, mining, and producing salt. Its authorized capital stock, of which substantially all was issued, was divided into $5,000,000 preferred and $7,000,000 common stock. Of this, within a month after its organization, about $5,500,000 of both classes of stock, having then a market value of approximately $2,600,-000, was applied to the purchase of the plants which were the subject-matter of this sale. Ruinous contracts were either entered into or assumed, so that, despite the payments declared to be dividends, and a roseate report of the company's condition on January 1, 1901, showing a large surplus, the defendant was so heavily involved in the spring of that year that a new corporation, the International Salt Company, was projected and organized in August, 1901, for the purpose in part of

taking over the stock of the defendant, of carrying and liquidating its indebtedness, and restoring it to a sound financial condition. A majority of the defendant's stockholders exchanged their securities, and thus the International Company became the majority stockholder of the defendant. The opposition to the present motion to confirm comes from a minority of the defendant's stockholders who refused to exchange their securities.

The professed attempt to save the defendant proved abortive. On September 29, 1902, an action was begun by the plaintiff in New Jersey for the appointment of receivers of the defendant on the ground of insolvency. An order appointing Nathan S. Beardslee and Frank P. McDermott receivers was entered the same day. Two days later this action was begun in this county, in which, on the basis of the New Jersey proceedings, the same receivers were appointed as ancillary officers. One of the items alleged to establish the defendant's insolvency was a judgment in the approximate sum of $238,000, recovered less than three weeks before the institution of the action in New Jersey on a claim owned then and now by the International Company, and assigned by it for the purposes of enforcement to one Melo. M. Belding, Jr. The receivers, both here and in New Jersey, were authorized to continue the business—this, apparently, on the representation that the assets of the defendant would be thereby conserved, that creditors could be paid in full, and that the stockholders would be protected and share in a handsome surplus. These representations were subsequently renewed by the receivers in a successful application to the United States Circuit Court for the District of New Jersey, which had theretofore, on an involuntary petition in bankruptcy, appointed its own receivers of the property of the defendant. On this application, having for its object the vacatur of this latter appointment, Receiver Beardslee, who had been a director of the defendant almost from its inception, and its president from the time the International Company acquired control, stated in an affidavit, verified October 29, 1902, that, besides realizing a daily profit of $500 since the receivers assumed charge, the company had large and profitable contracts on hand, and was operating six plants employing 400 hands. These six plants were the substantial properties involved in the subsequent sale.

Concurrent with these proceedings in the United States court, application for final judgment in this action was, on the default of the defendant, made to Mr. Justice Hall, sitting in Special Term, Part 1. In this connection it may be observed, in passing, that the defendant either defaulted in or consented to all the proceedings had, either here or in New Jersey, both by the plaintiff and the receivers. Preparatory to final judgment, Mr. Justice Hall, pursuant to the prayer, made an order directing a reference to Joseph F. Perdue "to take proof of the facts stated in the complaint for the purpose of enabling the court to render judgment." This order was promptly served on the referee. The attorney for the interests opposing the confirmation, having been apprised of the order by publication in the Law Journal, applied to the referee for notice of the hearings. The referee, having agreed to comply with the request, so notified the attorneys for the plaintiff. Objection was made, it being claimed that the parties asking it were not

entitled to notice. The referee, however, insisted, and at the request of plaintiff's attorneys fixed a day for the hearing. No sessions were ever had before him, the order of Mr. Justice Hall has been ignored to this day, and all proceedings under it apparently abandoned. In fact, despite this pending application for final judgment, nothing was done for a period of more than five months, when the receivers made an ex parte application to Mr. Justice Bischoff, sitting at Special Term, Part 2, for leave to advertise for bids on a petition, which, besides formal matters, merely set forth that, while the business had been conducted with some profit, the manufacture and sale of salt had, in their judgment, by reason of competition, become such that loss rather than gain was to be anticipated in the further conduct of the business. No disclosure of the previous application to Mr. Justice Hall or of the proceedings had under his order was made. Thus was the order procured by the terms of which the very extensive properties, located in various counties and at considerable distances apart, were required to be advertised for what would seem to be the entirely insufficient period of two weeks immediately prior to the date fixed in the advertisement for the reception of bids. It is inconceivable that responsible bidders, who would necessarily have to make examination of the large properties offered, could do so adequately within such a period, and it is therefore not surprising that the receivers in their petition of June 3, 1903, four days after the time limited in the advertisement had expired, reported to the court that no bids had been received. On the basis of this petition a further order was made by Mr. Justice Bischoff, but not until July 28, 1903, authorizing the receivers to sell the properties at public auction at Ithaca on September 15, 1903. This order, both as to form and to substance, was consented to by the plaintiff, no other parties except the plaintiff and the receivers being before the court. Again, there was no disclosure of the previous order of Mr. Justice Hall, made nine months before, requiring a reference before final judgment. And although the attorney who moved for final judgment before Mr. Justice Hall consented to the entry of this order of Mr. Justice Bischoff, and although the attorneys for the receivers had been the attorneys for the defendant, their appearance being recited in the order of reference, the information that such an order had been made, that no proceedings had been taken thereunder, or that those proceedings were suspended or abandoned, was again withheld from Mr. Justice Bischoff.

This withholding of information cannot be passed over. To my mind it taints the entire proceedings thereafter had. While it may be successfully urged that the disclosure was not required according to the literal provisions of rule 25, regard for its spirit should have prompted the communication. Substantially the same relief sought in the order of July 28th, was embraced in the demand for judgment resulting in the order of reference. The prayer of the complaint, which was made the basis of the latter order, was to the effect that the business of the defendant be liquidated, "and that its property be distributed among its bona fide creditors in accordance with the rules and principles applied by the courts of equity." This was in effect asking for a sale of the properties, which was the precise relief asked by the order of July

28th.  Both applications had the same ultimate result in view.  Quite irrespective of any rule, it was, in equity and good conscience, incumbent on those acquainted with the facts to advise the court before appealing to it for similar relief by different means.  It will not do to brush this question aside by saying that the first application was perfunctory, that the receivers, as such, had no knowledge of the previous application, and that they concealed nothing from the court.  The first application was not perfunctory.  It may have been unnecessary, but, having been made to accomplish what might also have been accomplished by other means, its existence or abandonment should have been communicated to the court before resorting to the other means.  And, so far as knowledge on the part of the receivers is concerned, the identity of counsel would seem to indicate that they must have had it.  From my knowledge of the uniform general practice prevailing among the justices of this court, I feel very well satisfied that, had the existence of the order of reference and the omission to proceed thereunder been brought to the court's attention, the motion would not have been granted without some satisfactory explanation of the reason for the abandonment of the reference.  And this explanation would in turn have necessitated the disclosure of such facts as would, in my judgment, have resulted at least in some form of notice or representation to the parties who sought to appear on the reference, and to whose interest it was to participate in the settlement of the terms of the order of sale.  If it is going too far to say that the justice would have permitted those parties to appear in the absence of an order allowing them to intervene, it is nevertheless likely that he would have entertained their suggestions as friends of the court, or, at least, being apprised of the fact that all was not harmony among the stockholders of the defendant, would not have signed, without careful scrutiny, an order of sale consented to by the parties to the record, and which, in view of that consent, was probably signed as a matter of course.  So much for the manner of procuring the terms of sale.  Now a word as to the terms of sale themselves.

The material term is as follows:

"Said property shall be offered for sale in parcels, as hereinafter set forth, and then again as a whole; and if the price offered for the whole shall exceed the aggregate price offered for the said parcels, then the property shall be struck off and sold to the purchaser of the whole, subject to the confirmation of this court.  If the price offered for the whole shall be less than the aggregate of the price offered for the several parcels, then the several parcels shall be struck off and sold to the respective purchasers thereof, subject to confirmation by this court."

If the purpose of this term was to discourage individual bidders in the interest of one contemplating the purchase of the entire properties at a minimum figure, it is difficult to see how it could have been more adroitly drawn.  It may be that in some cases a sale of parcels by such a term has been approved, but here the effect seems to have been, as appears amply by numerous credible affidavits of responsible persons, to cause intending bidders to abstain from competing, as it was evident that the blanket bidder, to follow the individual one, would have to make merely a nominal advance, not on each bid, but over the aggre-

gate of all the bids. It certainly appears that all the properties can be most profitably controlled under one ownership, and there is nothing to be said against a bona fide purchaser acquiring by bona fide means the entire offering at the price most advantageous to him. But the rights of those interested in the proceeds of the sale require that the properties be offered in a manner which, while not excluding their acquisition as a whole, nevertheless induces the best possible price for each separate parcel. There is not much inducement for the individual bidder when he knows that he is merely laying a foundation for the blanket bidder, and it is not reasonable to assume that under such circumstances responsible parties, whose aim and endeavor is to acquire a particular parcel, will waste their time in attending the sale or in furnishing data to the blanket bidder.

I cannot escape the conclusion that this order of July 28th was drawn in the interest of the International Company, the present holder of the majority of the defendant's stock, as the contemplated blanket bidder. This appears from the provision in the order—not, however, included in the published terms of sale—to the effect that, if any creditor of the defendant whose claim had been allowed by the receiver should become the purchaser of one or all the parcels, the amount of the claim, to the extent of 80 per cent. thereof, exclusive of · 10 per cent. earnest money required to be deposited on the day of sale, might be offset against the purchase price. Further, the papers warrant the conclusion—in fact no other inference is possible—that, though bid in by a third party, the real purchaser at the sale was the International Company, which had theretofore filed · with the receiver the reassigned Belding claim already referred to, which as a judgment had in part precipitated the receivership and the bankruptcy, and which, being vacated as a judgment, helped to nullify the bankruptcy proceedings. This serviceable claim has· been the only substantial one allowed by the receiver, and its real owner, the International Company, therefore, the only creditor which could avail itself ·of the 80 per .cent. application clause in the order. Without considering the question of an .illegal preference obtained by this clause, it is sufficient to say that the manner in which . the order of .sale was procured, and the inclusion of the questionable terms referred to, justify me in applying the most rigorous test to the details of the sale itself. While the sale was advertised and notices thereof were sent to creditors and stockholders as required by the order, there does not seem to have been any general distribution of the all-important terms of ·sale. One affiant states that he saw the terms within two weeks of the date set, but a number of affidavits are to the effect that it was impossible to secure the terms until the very day of sale. Without going to the length of holding, on the conflicting affidavits, that Receiver Beardslee refused to furnish the terms, the inference is nevertheless warranted that no great willingness to communicate was manifested, and that intending bidders were discouraged, rather than facilitated, ·in their efforts to put themselves in full possession of the facts.

Coming now to the sale itself: The court is asked to confirm a bid of $337,500. The sum total of the individual bids was $218,157. On the blanket bidding the latter sum was raised to the former by the

nominal competition of two bidders, who, it sufficiently appears, represented the same interest, that of the International Company. The details of the individual bids are not given, but a few facts will serve to show their complete inadequacy. The properties which were sold for $337,500 were purchased in 1899 at an original outlay of $5,500,000 in stock, having at the time of purchase an approximate market value of $2,600,000. In fact, these very plants were carried as an asset on January 1, 1901, in the annual report of the defendant, at the sum of $8,518,306.36. I have read and tabulated with considerable care the various estimates made by the many experts, and have been especially impressed by the scientific, detailed, and conservative valuations of James O. McClure, a civil engineer of large experience, who installed most of the plants in question, and who supports his conclusions with a very competent foundation of facts. Mr. McClure, who in his main estimates is corroborated by other experts who have had to do with the same properties, takes up each individual plant, making an appraisal of its present market value and of its value at a forced sale. This latter value is arrived at in each instance by what seems to be a ruthless cut. The estimates also treat as practically negligible quantities all the plants except the six in actual operation, and which are the six referred to in the application to the United States court as yielding a profit of $500 a day. Mr. McClure's total appraised value of all the plants is $1,149,200; his total valuation at a forced sale is $694,200, which is far more than double the price realized. That this is conservative and not fanciful would appear from the affidavit of one of the intending bidders, who swears that he was deterred by the terms of sale and the scant information; that he purposed bidding as high as $125,000 for parcel No. 3, considering it worth at forced sale at least $150,000. This parcel was struck off for $74,500. Two other intending purchasers state substantially the same facts as to the same parcel. It is unnecessary to pursue the subject further, or to go through the entire list enumerating what I am satisfied are equally glaring discrepancies between the knockdown price and an ultraconservative forced sale valuation. The more I have read these papers, the more have I become convinced that there should be a resale, with greater publicity, greater opportunity to investigate, and more attractive and equitable terms of sale. There is nothing in the conclusion reached which is in conflict with the decision of Mr. Justice Davis denying the motion of the present opposing interest to intervene. He stated in his memorandum that it would be for the court to pass upon the fairness and adequacy of the bid. This the court has now done.

I have therefore concluded that the motion to confirm the sale should be denied. On the settlement of the order I will hear suggestions of counsel as to future proceedings.

Motion denied.